THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

BRANDON RODRIGUEZ,

      Plaintiff,

v.

COUNTY OF WESTCHESTER;
CORRECT CARE SOLUTIONS LLC;
NEW YORK CORRECT CARE SOLUTIONS
MEDICAL SERVICES PC;
DOLORES CURBELO M.D.; JANEL SEWELL;
MARIA NESTRO; STEVEN SANTIAGO;
CITY OF NEW YORK; CORIZON HEALTH INC.;
EDMUND DUFFY; MONIQUE OWENS;
RENEE ACKERMAN; and DANIEL ASHITY,

      Defendants.

-----------------------------------------------------------X

Civil Action No.
15-cv-09626 (PAE)

AMENDED COMPLAINT

JURY TRIAL DEMANDED

By and through his attorneys Rice & Rice Attorneys At Law, Plaintiff Brandon Rodriguez alleges upon knowledge, information, and/or belief as follows:

## PRELIMINARY STATEMENT

1. This is a civil action seeking monetary relief against Defendants County of Westchester ("Westchester"); Correct Care Solutions LLC ("CCS"); New York Correct Care Solutions Medical Services PC ("NYCCS"); certain employees of CCS and NYCCS, *to wit*, Dolores Curbelo M.D. ("Curbelo"); Janel Sewell ("Sewell"); and Maria Nestro ("Nestro"); a certain employee of Westchester County, *to wit*, Department of Correction Officer Steven Santiago ("Santiago"); City of New York ("New York"); Corizon Health Inc. ("Corizon"); certain employees of New York, *to wit*, Department of Correction Warden Edmund Duffy ("Duffy"); Department of Correction Officer Monique Owens ("Owens"); and Department of Correction Officer Renee Ackerman ("Ackerman"); and a certain employee of Corizon, *to wit*,

Daniel Ashity ("Ashity").

2. It is alleged that the Defendants, acting jointly and severally, under the color of law, committed a series of negligent and unlawful acts that resulted in the deliberate indifference towards the serious medical needs of Brandon Rodriguez between August 26, 2014 and January 1, 2015, causing him to receive inadequate and untimely medical treatment for his condition of multiple sclerosis which led to his extreme pain, discomfort, and eventually, permanent disability. It is further alleged that Mr. Rodriguez's constitutional rights were violated when he was not provided with a continuity of care upon his release from the Westchester County Jail ("WCJ") and subsequent transfer to the New York City Jail at Rikers Island ("Rikers") which led him to being placed in a unit that did not address his serious medical needs and ultimately led him to be subjected to violence from other inmates and in so doing, deprived Mr. Rodriguez of rights secured by the United States Constitution and the State of New York. The Plaintiff was a detainee and inmate at the WCJ and Rikers during the time of his incarceration.

3. Additionally, it is alleged that Defendants Westchester, CCS, NYCCS, New York, and Corizon had in force unconstitutional policies, practices and customs that caused Mr. Rodriguez to suffer the aforementioned constitutional deprivations. Specifically, Defendants Westchester, CCS, and NYCCS, had in place deficient policies, practices and customs related to the provision of health care services. Unconstitutional policies, practices and customs of Defendant Westchester related to the medical care provided at WCJ were found to exist by the United States Department of Justice ("DOJ") pursuant to a Civil Rights of Institutionalized Persons Act ("CRIPA") investigation and worsened, when Defendants Westchester, CCS, and NYCCS, implemented new policies, practices, and customs that significantly reduced the quality and quantity of medical staff available to inmates and detainees; that discontinued the partnership with Westchester Medical Center ("WMC"); that failed to implement an adequate intake screening process; that failed to ensure that treatment and the administration of medication to inmates implemented was in accordance with generally accepted professional standards of care; that failed to establish adequate guidelines for the transportation of inmates and detainees to WMC; and that failed to ensure that continuity of care was provided to inmates and detainees who suffered from serious medical conditions. Similarly, New York and Corizon had in place unconstitutional policies, practices, and customs related to the provision of health care, particularly, the process by which they admitted inmates and detainees to its infirmary unit, and

how medication was dispensed to inmates and detainees with serious medical needs.

4. Lastly, it is alleged that Defendant New York had in force unconstitutional policies, practices, and customs related to the safety measures put in place to protect adolescent Rikers inmates and detainees from harm caused by inmate-on-inmate violence. Unconstitutional policies, practices, and customs related to the harm inflicted on adolescent inmates and detainees at Rikers were previously found to exist by the DOJ pursuant to a CRIPA investigation and were not improved by the time Mr. Rodriguez was incarcerated at Rikers on December 24, 2014.

## PARTIES

5. Brandon Rodriguez, at all times relevant to this litigation, was a citizen of Westchester County, New York and was an adolescent at 18 years of age.

6. At all times relevant herein, Defendant Westchester was a municipal corporation duly organized under and by virtue of the laws of the State of New York, and was responsible for the policies, practices, and customs related to the delivery of health care to inmates and detainees at WCJ.

7. At all times relevant herein, Defendant CCS was at all times a private business incorporated in Kansas with its principal office located in Tennessee. CCS contracted with Westchester for the provision of medical care and treatment for WCJ inmates and detainees from July 26, 2010 through the present. It is sued in its corporate capacity and as a state actor.

8. At all times relevant herein, Defendant NYCCS was at all times a corporate affiliate of CCS created solely to be responsible for the provision of medical care and treatment to WCJ inmates and detainees from July 26, 2010 through the present. It is sued in its corporate capacity and as a state actor.

9. At all times relevant herein, Defendant Curbelo was employed by CCS and NYCCS as a doctor in the WCJ, acting under color of law and within the scope of her employment. She is named in her individual capacity and as a state actor.

10. At all times relevant herein, Defendant Sewell was employed by CCS and NYCCS in the WCJ as a nurse, acting under color of law and within the scope of her employment. She is named in her individual capacity and as a state actor.

11. At all times relevant herein, Defendant Nestro was employed by CCS and

NYCCS in the WCJ as a nurse, acting under color of law and within the scope of her employment. She is named in her individual capacity and as a state actor.

12. At all times relevant herein, Defendant Santiago was employed by Westchester as a correction officer, acting under color of law and within the scope of his employment. He is named in his individual capacity and as a state actor.

13. At all times relevant herein, Defendant New York was a municipal corporation duly organized under and by virtue of the laws of the State of New York and was responsible for overseeing the operation of the jails located on Rikers Island.

14. At all times relevant herein, Defendant Corizon was at all times a private business incorporated in Tennessee that contracted with New York for the provision of medical care and treatment to New York inmates and detainees. It is sued in its corporate capacity and as a state actor.

15. At all times relevant herein, Defendant Duffy was employed by New York as a Warden at the Rikers Island jail, acting under color of law and within the scope of his employment. He is named in his individual capacity and as a state actor.

16. At all times relevant herein, Defendant Owens was employed by New York as a correction officer, acting under color of law and within the scope of her employment. She is named in her individual capacity and as a state actor.

17. At all times relevant herein, Defendant Ackerman was employed by New York as a correction officer, acting under color of law and within the scope of her employment. She is named in her individual capacity and as a state actor.

18. At all times relevant herein, Defendant Ashity was employed by Corizon as a physician assistant at Rikers, acting under color of law and within the scope of his employment. He is named in his individual capacity and as a state actor.

## JURISDICTION AND VENUE

19. This court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 over claims arising from 42 U.S.C §1983; and the Eighth and Fourteenth Amendments of the U.S. Constitution. Plaintiff further invokes the supplemental jurisdiction of the Court under 28 U.S.C. §1367 to hear and decide claims arising under state law.

20. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391 (b)

in which the events giving rise to this action occurred within the district.

## PRELIMINARY FACTS

21. That between May 6, 2008 and July 25, 2010, Defendant Westchester had an agreement with Westchester County Health Care Corporation ("WCHCC"), a public benefit corporation controlled by WMC, to provide medical care and treatment to WCJ inmates.

22. On November 19, 2009, pursuant to a CRIPA investigation previously performed at the WCJ during February 25-28, 2008, the DOJ issued a Findings Letter to Westchester regarding certain conditions at the WCJ. The letter provided the findings of the investigation, the facts supporting them, and the minimum remedial steps that were necessary to address the deficiencies that were identified. Ultimately, DOJ found that WCJ inmates did not receive adequate medical care.

23. The letter issued by DOJ specifically states in its Findings section:

> We found that WCJ has a pattern of failing to: (1) adequately protect inmates from harm and serious risk of from staff; and (2) provide inmates with adequate medical and mental health care. These deficiencies violate WCJ inmates' constitutional rights. *Id.*, p. 7.

24. As it relates to Medical Care Deficiencies, the DOJ letter states:

> Jail officials are responsible for providing adequate medical care to inmates. Moreover, a jail may not deny or intentionally interfere with medical treatment. A delay in providing medical treatment may be so significant that it amounts to a denial of treatment. Our investigation revealed that there are certain aspects of the medical care and treatment offered at WCJ to be commended, for example, ***the Jail's affiliation with the Westchester Medical Center*** …However, there are some areas where the medical care provided at WCJ falls below the constitutionally required standards of care. *Id.*, p. 19 (emphasis added).

25. Additionally, several remedial measures were suggested to address the

constitutional health care deficiencies of WCJ which include the following:

> 1. Intake Screening: (a) Ensure that adequate intake screening and health assessments are provided. (b) Develop and implement an appropriate medical intake screening instrument that identifies observable and non-observable medical needs, including infectious diseases, and ensure timely access to a physician when presenting symptoms require such care. *Id.*, p. 37.

> 4. Access to Health Care. (a) Ensure inmates have adequate access to health care. (b) Ensure that the medical request process for inmates is adequate and provides inmates with adequate access to medical care. This process should include logging, tracking, and timely responses by medical staff. *Id.*, p. 38.

> 5. Medication Administration: (a) Ensure that treatment and administration of medication to inmates is implemented in accordance with generally accepted professional standards of care. *Id.*, p. 38.

26. Shortly after the issuance of its report, DOJ published the Findings Letter for public consumption, which is incorporated by reference herein. *See* http://www.justice.gov/crt/about/spl/documents/Westchester_findlet_11-19-09.pdf.

27. That on or about July 26, 2010, when Defendant Westchester began its relationship with CCS and NYCCS for the provision of comprehensive health care to WCJ inmates and detainees, the affiliation with WMC was discontinued.

28. That on August 4, 2014, pursuant to a CRIPA investigation previously performed at Rikers in 2013, the DOJ issued a Findings Letter to Defendant New York regarding certain conditions at Rikers. The letter provided the findings of the investigation, the facts supporting them, and the minimum remedial steps that were necessary to address the deficiencies that were identified. Ultimately, the DOJ found that Rikers inmates are not adequately protected from harm caused by violence inflicted by other inmates.

29. The letter issued by DOJ specifically states in its Findings section:

> We find that the New York City Department of Correction systematically has failed to protect adolescent inmates from harm in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. This harm is the result of…high levels of inmate-on-inmate violence. *Id.*, p. 4.

30. Among the systematic deficiencies that lead to high levels of inmate violence, the following were listed in the DOJ report:

- An inadequate classification system for adolescent inmates;
- Inadequate supervision of inmates by staff;
- Inadequate training on managing adolescents; and
- General failures by management to adequately address the extraordinarily high levels of violence perpetrated against and among the adolescent population. *Id.*, p. 4.

31. Ultimately, the Report held that Rikers is a dangerous place for adolescents and that a pervasive climate of fear exists. It recommended that New York ***must*** implement corrective measures to address the deficiencies to adequately protect the adolescent population from harm. *Id.*, p.8, 20. (emphasis added).

32. Shortly after the issuance of its report, DOJ published the Findings Letter for public consumption, which is incorporated by reference herein. *See* justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf

## TORMENT ENDURED BY BRANDON RODRIGUEZ

33. On August 26, 2014, Mr. Rodriguez was arrested and incarcerated at the WCJ. During his medical intake screening process, he made a complaint to Katherine Elmore, a WCJ Mental Health Provider, that he was "dizzy". However, Defendants Westchester, CCS, and NYCCS failed to provide the Plaintiff with an adequate intake screening assessment capable of identifying his observable and non-observable medical needs.

34. On August 27, 2014, the Plaintiff again complained of dizziness, and also made complaints of a headache and blurred vision. He relayed these concerns to Defendant Sewell while asking to see a doctor. However, for several days, Defendant Sewell failed to refer

the Plaintiff to see a doctor despite his having obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC. These symptoms continued for the next eight days.

35. On September 4, 2014, the Plaintiff complained to Defendant Sewell of ringing in his ear, dizziness, nausea, blurriness in his eyes, and stated to her that he could not "feel the left side of his face". The Plaintiff eventually fell off his bed as a result of his dizziness and was helped up by Defendant Sewell. Despite his pleas to be taken to the hospital, or in the alternative, for him to merely see a doctor, Defendant Sewell ignored his requests and instead, recklessly treated him with a pain reliever. The Plaintiff went in and out of consciousness throughout the evening, eventually hitting his head on the sink, and losing consciousness until the next morning. At this time, Defendants Westchester, CCS, NYCCS, and Sewell recklessly failed to diagnose, treat, or refer the Plaintiff to a neurologist regarding his obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC.

36. On September 5, 2014, Defendant Curbelo recklessly misdiagnosed the Plaintiff as having an ear infection and merely treated him with eardrops and nausea medicine. After his being seen by Defendant Curbelo later that afternoon, Defendant Nestro observed that the Plaintiff exhibited symptoms of being very nauseous and dizzy; was unable to move his left arm and left leg; blurred vision; and was unable to drink anything. Later that evening, the Plaintiff again complained to Defendant Sewell that his gait was unsteady due to his ongoing dizziness and that he wanted the ringing in his ear to go away. At this time, Defendants Westchester, CCS, NYCCS, Curbelo, Nestro, and Sewell recklessly failed to diagnose, treat, or refer the Plaintiff to a neurologist regarding his obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC.

37. On September 6, 2014, the Plaintiff was observed sleeping in the bed for most of the day by Josephine Jacobs ("Jacobs") and Robin Godwin ("Godwin"), nurses employed by CCS and NYCCS, as he suffered from somnolence and diminished wakefulness. At this time, Defendants Westchester, CCS, NYCCS, and Curbelo recklessly failed to diagnose, treat, or refer the Plaintiff to a neurologist regarding his obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC.

38. On September 7, 2014, the Plaintiff was again observed sleeping in the bed for

most of the day by Godwin and Esskee Doucet ("Doucet"), another nurse employed by CCS and NYCCS, as he suffered from somnolence and extreme diminished wakefulness. However, at this time, Defendants Westchester, CCS, NYCCS, and Curbelo recklessly failed to diagnose, treat, or refer the Plaintiff to a neurologist regarding his obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC.

39. On September 8, 2014, despite the fact that the Plaintiff was now unable to eat food, when he was seen in the morning by Defendant Curbelo, she recklessly failed to diagnose, treat, or refer the Plaintiff to a neurologist regarding his obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC. Later that evening, Diane Tufaro ("Tufaro"), a nurse practitioner employed by CCS and NYCCS, observed that the Plaintiff was still suffering from somnolence, diminished wakefulness and vomiting, yet, as the Plaintiff's somnolence, diminished wakefulness, and nausea worsened, Defendants Westchester, CCS, NYCCS, and Curbelo, recklessly failed to diagnose, treat, or refer the Plaintiff to a neurologist regarding his obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC.

40. On September 9, 2014, the Plaintiff was again seen in the morning by Defendant Curbelo who observed that he suffered from somnolence, diminished wakefulness, and nasal congestion while later that afternoon, Defendant Nestro observed that the Plaintiff suffered from somnolence, diminished wakefulness, was not able to eat, and did not feel like talking. Importantly, when Gregg Nardo, a social worker employed by CCS and NYCCS, met with the Plaintiff that same afternoon, the Plaintiff became frustrated and upset due to not being taken to the WMC for a medical follow up. Later that evening, Defendant Sewell met with the Plaintiff who complained of nausea, blurred vision, an inability to eat, and whose somnolence and diminished wakefulness was worsening; yet at this time Defendants Westchester, CCS, NYCCS, Curbelo, and Sewell recklessly failed to diagnose, treat, or refer the Plaintiff to a neurologist regarding his obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC.

41. On September 10, 2014, at approximately 12:35 a.m., Moddy Kiluvia, a mental health provider employed by CCS and NYCCS, attempted to interview the Plaintiff who at that time appeared weak and was unable to answer any questions. He was only able to whisper

incoherent words. However, ten minutes later at approximately 12:45 a.m., Defendant Sewell examined the Plaintiff and did not record that anything was wrong with him. At this time, Defendants Westchester, CCS, NYCCS, Curbelo, and Sewell recklessly failed to diagnose, treat, or refer the Plaintiff to a neurologist regarding his obvious symptoms of a neurological disorder and denied the Plaintiff access to specialty medical services available at WMC.

42. On September 10, 2014 at approximately 8:50 a.m., as the Plaintiff was going in and out of consciousness, Defendant Nestro noticed that the Plaintiff's right pupil was higher than his left pupil and that his right eye was closed halfway. Defendant Curbelo then examined the Plaintiff and noticed the same at approximately 12:35 p.m. An ambulance was finally called at 12:55 p.m. – sixteen days after the Plaintiff's initial complaint of feeling dizzy – to transport him to WMC.

43. On September 10, 2014, at approximately 1:30 p.m., the Plaintiff was transported and later admitted to WMC with symptoms which included, but were not limited to facial, leg and arm numbness; double vision in his left eye; closure of his right eye; dizziness; gait imbalance; slurred speech; and ear ringing with some hearing loss.

44. After providing him with access to a neurologist, diagnostic testing, steroid treatment, and other essential medical care, on October 1, 2014, three weeks after first being admitted, WMC discharged the Plaintiff back to the custody and care of the WCJ. Later in the month of October, 2014, the Plaintiff was officially diagnosed as having multiple sclerosis. Throughout the month of October 2014, the Plaintiff was denied access to physical therapy during the month of October by Defendants Westchester, CCS, and NYCCS.

45. On December 11, 2014, the Plaintiff was again admitted to the WMC as a result of an exacerbation of his multiple sclerosis with symptoms including but not limited to seizures, face and arm numbness, ringing in his ear, and severe headaches.

46. On December 15, 2014, after providing him with access to a neurologist, steroid treatment, and other essential medical care, WMC discharged the Plaintiff back to the custody and care of the WCJ where he was treated with the steroid Prednisone.

47. On December 24, 2014, the Plaintiff was transferred from the WCJ to Rikers. In transferring the Plaintiff, despite being instructed to do so, Defendant Santiago failed to provide Rikers with the Plaintiff's Patient Summary Profile. Santiago's actions and omissions constituted a denial in the continuity of care and patient abandonment by Defendants Westchester, CCS, and

NYCCS.

48. On December 24, 2014, upon his intake at Rikers, the Plaintiff informed Defendant Ashity that he had multiple sclerosis for which he was recently hospitalized and was currently taking the steroid Prednisone, that he was scheduled for a follow up examination, and that he was experiencing weakness, with pain in his right arm and left leg. After disregarding his complaints and denying the Plaintiff his prescribed Prednisone medication, Defendants New York and Corizon refused to admit the Plaintiff to an infirmary unit and instead attempted to place the Plaintiff in general population. The Plaintiff then signed into protective custody and was initially housed in the Robert N. Davoren Complex ("RNDC") before being transferred the next day on Christmas to the George Motchan Detention Center ("GMDC").

49. On January 1, 2015, as a result of the Plaintiff not receiving a continuity of care and being abandoned by Defendants Westchester, CCS, NYCCS, and Santiago, and not being housed in an infirmary unit at Rikers Island, unable to defend himself, he was assaulted by six inmates – members of the Patria gang - who used homemade knives, fists, feet, chairs and other weapons to cause the Plaintiff serious physical injury which included 18 puncture wounds to his chest, back, face, arms, and a laceration to his left hand which required six stiches. No New York Department of Correction staff members were present to prevent or break up the gang assault by these inmates. Those specific gang members previously assaulted a different inmate during the period that the Plaintiff was housed there; however, they were recklessly allowed to stay and eventually assault the Plaintiff.

50. A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served upon Westchester on December 4, 2014. More than thirty days have elapsed without the matter being resolved by Westchester. The Notice of Claim provided information regarding the actions that Westchester took involving the inadequate medical care provided to the Plaintiff.

51. A Notice of Claim pursuant to New York General Municipal Law § 50-e was timely served upon New York on March 30, 2014. More than thirty days have elapsed without the matter being resolved by New York. The Notice of Claim provided information regarding New York's failure to protect the Plaintiff from violence inflicted by other inmates.

52. Similar incidents of inadequate medical care by Westchester, CCS, and NYCCS occurred in the past as evidenced by internal complaints, press clippings, and pleadings. Notably,

in 2014, a federal lawsuit was filed by the Estate of Rashad McNulty, a former inmate at WCJ, regarding similar claims of inadequate and untimely medical treatment from Defendants Westchester, CCS, and NYCCS which ultimately led to his death.

53. Similar incidents of inadequate medical care and inadequate protection from harm by New York and Corizon is evidenced by internal complaints, press clippings, and pleadings. Notably, in December 2014, a federal lawsuit was initiated by the DOJ regarding the failure of New York to protect its inmates from harm.

## FEDERAL CLAIMS

### FIRST CAUSE OF ACTION - § 1983 MONELL CLAIMS AGAINST DEFENDANTS WESTCHESTER, CCS, NYCCS, NEW YORK AND CORIZON

54. Plaintiff incorporates the allegations contained in the previous paragraphs and further alleges as follows:

55. The actions, omissions, and decisions made by Defendants Westchester, CCS, NYCCS, New York and Corizon regarding the provision of comprehensive health care to WCJ inmates and detainees constitute their policies, practices and customs.

56. That the actions taken between August 26, 2014 and December 24, 2014 by the Defendants Curbelo, Sewell, Nestro and Santiago in providing constitutionally deficient health care to the Plaintiff were done in accordance with the policies, practices, and customs of Defendants Westchester, CCS, and NYCCS and that said policies, practices, and customs related to the inadequate provision of health care treatment; the inadequate medical intake screening process of inmates and detainees; the inadequate guidelines related to the transportation of inmates and detainees with serious medical needs to WMC; the lack of access to specialty medical services provided by WMC; the inadequate administration of medication in accordance with generally accepted professional standards of care; and the inadequacy surrounding the continuity of care provided to inmates and detainees suffering from serious medical conditions were so persistent and widespread that they constituted an official policies, practices and customs.

57. That these policies, practices and customs of Defendants Westchester, CCS, and NYCCS - who were responsible for the provision of comprehensive health care to WCJ inmates

and detainees - were inadequate in that there was a deliberate indifference to the Plaintiff's serious medical needs and that Defendants Westchester, CCS, and NYCCS were totally unconcerned with his welfare and the value of his life.

58. That these policies, practices, and customs of Defendants Westchester, CCS, and NYCCS, led to the refusal to provide adequate medical care to the Plaintiff; to the failure to detect the Plaintiff's observable and non-observable serious medical needs; to the delay of proper care to the Plaintiff; to the failure to diagnose his serious medical condition; to the negligent training of its employees; to the lack of neurological physician access for the Plaintiff; to the denial of specialty medical services available at WMC in direct contradiction of what was commended and referred to positively in the Westchester CRIPA findings by the DOJ; to patient abandonment and a denial in the continuity of care regarding his serious medical condition; and to the misdiagnosis and indifference of the serious medical needs and of the Plaintiff and deprived him of the rights, privileges, and immunities secured by the Eighth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §1983.

59. That the actions taken between December 24, 2014 and January 1, 2015 by Defendant Ashity in providing constitutionally deficient health care to the Plaintiff were done in accordance with the policies, practices, and customs of Defendants New York and Corizon and that said policies, practices, and customs related to the inadequate provision of health care treatment; and the inadequate medical intake screening process of inmates and detainees were so persistent and widespread that they constituted an official policies, practices and customs.

60. That these policies, practices and customs of Defendants New York and Corizon - who were responsible for the provision of comprehensive health care to Rikers inmates and detainees - were inadequate in that there was a deliberate indifference to the Plaintiff's serious medical needs and that Defendants New York and Corizon were totally unconcerned with his welfare and the value of his life and deprived him of the rights, privileges, and immunities secured by the Eighth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §1983.

61. The actions, omissions, and decisions made by Defendant New York regarding the protection of inmates and detainees from violence inflicted by other inmates and detainees constitute their policies, practices and customs.

62. That the actions taken between December 25, 2014 and January 1, 2015 by

Defendants Duffy, Owens, and Ackeridge in failing to provide adequate protection and supervision to the Plaintiff were done in accordance with the policies, practices, and customs of Defendant New York and that said policies, practices, and customs were so persistent and widespread that they constituted official policies, practices and customs and deprived the Plaintiff of the rights, privileges, and immunities secured by the Eighth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. §1983.

## SECOND CAUSE OF ACTION - § 1983 CLAIM FOR DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS AGAINST DEFENDANTS CURBELO, SEWELL, NESTRO, SANTIAGO, AND ASHITY

63. Plaintiff incorporates the allegations contained in the previous paragraphs and further alleges as follows:

64. That the Plaintiff was an inmate and/or detainee at WCJ during the time of his incarceration between on August 26, 2014 and December 24, 2014 and had a constitutional right to receive adequate and timely medical treatment and care along with a continuity of care regarding his serious condition of multiple sclerosis.

65. That between on August 26, 2014 and September 10, 2014 the Plaintiff presented severe and urgent medical needs which posed a sufficiently serious risk of death and harm, and he was not treated with adequate and timely medical care by Defendants Curbelo, Sewell and Nestro.

66. Defendants Curbelo, Sewell, and Nestro knew of and recklessly disregarded a substantial risk of serious harm to the Plaintiff's health and safety despite the obvious indications that he was suffering from a serious neurological disorder. Specifically, between August 26, 2014 and September 10, 2014, the Plaintiff was improperly screened for observable and non-observable medical needs; denied timely access to a neurologist; was not adequately protected from the harm caused by representatives of Westchester, CCS and NYCCS; was subject to extreme humiliation; denied access to specialty medical services available at WMC; and was not provided with medication in accordance with generally accepted professional standards of care.

67. That Defendants Curbelo, Sewell and Nestro's actions and/or omissions constitute violations of Decedent's Eighth and Fourteenth amendment rights pursuant to 42 U.S.C. §1983 by their conduct in denying him adequate and timely medical treatment and allowing him to

wither in pain in his bed for days while his medical condition worsened and that said conduct was repugnant to the conscience of mankind and incompatible with the evolving standards of decency that mark the progress of a maturing society in that it denied the Plaintiff the opportunity to have a better prognosis.

68. That on December 24, 2014, Defendant Santiago knew of and recklessly disregarded a substantial risk of serious harm to the Plaintiff's health and safety which required a continuity of care upon his transfer to Rikers Island, yet despite being instructed to do so, did not provide Rikers Island with his Patient Summary Profile that outlined his deteriorating health and his need to be placed in an infirmary unit. As a direct result of this omission, one week later on January 1, 2015, the Plaintiff was brutally assaulted at Rikers Island by several inmates and suffered 18 puncture wounds throughout his body. It was foreseeable that if no instructions regarding the continuity of care for the Plaintiff were provided to the transferring correctional facility, then if not placed in an infirmary unit, the Plaintiff would not be able to receive adequate care for his multiple sclerosis and be prone to violence from other inmates.

69. That Defendant Santiago's actions and/or omissions constitute violations of Plaintiff's Eighth and Fourteenth amendment rights pursuant to 42 U.S.C. §1983 by their conduct in denying him a continuity of care upon his transfer to Rikers Island and that said conduct was repugnant to the conscience of mankind and incompatible with the evolving standards of decency that mark the progress of a maturing society.

70. That the Plaintiff was an inmate and/or detainee at Rikers during the time of his incarceration beginning on December 24, 2014 and had a constitutional right to receive adequate and timely medical treatment and care regarding his serious condition of multiple sclerosis.

71. That between December 24, 2014 and January 1, 2015, Defendant Ashity knew of and recklessly disregarded a substantial risk of harm to the Plaintiff's health when the Plaintiff presented severe and urgent medical needs which posed a sufficiently serious risk of death and harm, and he was not placed in an infirmary unit despite being told by the Plaintiff and him having obvious indications that he was suffering from a serious neurological disorder.

72. That Defendant Ashity's actions and/or omissions constitute violations of Plaintiff's Eighth and Fourteenth amendment rights pursuant to 42 U.S.C. §1983 by his conduct in denying him adequate and timely medical treatment and allowing him to be placed in a unit that did not attempt to treat the Plaintiff for his serious medical condition and that said conduct

was repugnant to the conscience of mankind and incompatible with the evolving standards of decency that mark the progress of a maturing society in that it caused the Plaintiff to be brutally assaulted.

## THIRD CAUSE OF ACTION - § 1983 CLAIM FOR FAILURE TO PROTECT PLAINTIFF FROM VIOLENCE AGAINST DEFENDANTS DUFFY, OWENS AND ACKERIDGE

73. Plaintiff incorporates the allegations contained in the previous paragraphs and further alleges as follows:

74. That the Plaintiff was an inmate and/or detainee at Rikers during the time of his incarceration beginning on December 24, 2014 and had a constitutional right to be protected from violence inflicted by other inmates.

75. That between December 25, 2014 and January 1, 2015, Defendants Duffy, Owens, and Ackeridge knew of and recklessly disregarded a substantial risk of harm to the Plaintiff's health when they failed to properly supervise the inmates located in the Plaintiff's housing unit and did not fulfill their obligation to ensure the Plaintiff's safety by monitoring the conduct of the inmates of that unit; failed to properly classify the Plaintiff for appropriate housing; failed to provide accurate reporting of the January 1, 2015 assault against the Plaintiff; and failed to ensure that other staff members were capable and qualified to monitor the inmates in said housing unit.

76. That the actions and/or omissions of Defendants Duffy, Owens, and Ackeridge constitute violations of Plaintiff's Eighth and Fourteenth amendment rights pursuant to 42 U.S.C. §1983 by their conduct in failing to keep the Plaintiff safe from violence inflicted by other inmates and that said conduct was repugnant to the conscience of mankind and incompatible with the evolving standards of decency that mark the progress of a maturing society in that it caused the Plaintiff to be brutally assaulted.

## FOURTH CAUSE OF ACTION – SUPERVISORY LIABILITY AGAINST DEFENDANTS CURBELO AND DUFFY

77. Plaintiff incorporates the allegations contained in the previous paragraphs and further alleges as follows:

78. Defendant Curbelo was responsible for supervising and training the medical staff who provided treatment to WCJ inmates and detainees and failed to properly supervise and train the medical staff regarding the reckless and negligent medical treatment provided to the Plaintiff between August 26, 2014 and December 24, 2014.

79. Defendant Duffy was responsible for supervising and training the correction staff at Rikers and failed to properly supervise and train the correction staff regarding constitutional protections that are required for inmates and detained to be free from violence inflicted by other inmates.

80. As a result of the inadequate supervision provided by Defendants Curbelo and Duffy, the Plaintiff was deprived of the rights, privileges and immunities secured by the Eighth and Fourteenth amendment rights pursuant to 42 U.S.C. §1983.

## STATE CLAIMS

## FIFTH CAUSE OF ACTION - MEDICAL MALPRACTICE AGAINST DEFENDANTS WESTCHESTER, CCS, NYCCS, CURBELO, SEWELL, NESTRO, NEW YORK, CORIZON, AND ASHITY

81. Plaintiff incorporates the allegations contained in the previous paragraphs and further alleges as follows:

82. That between August 26, 2014 and December 24, 2014, the medical treatment provided to the Plaintiff was given and rendered in an improper, negligent, and careless manner in that Defendants Westchester, CCS, NYCCS, Curbelo, Sewell and Nestro failed to employ the skill, care, and diligence commonly and ordinarily possessed by, and required of medical providers in the same locality; and in that Defendants Westchester, CCS, NYCCS, Curbelo, Sewell, and Nestro deviated from the proper standard of care and failed to employ reasonable and proper steps, procedures, and practices for the health, welfare, and safety of the Plaintiff.

83. That as a result of Defendants Westchester, CCS, NYCCS, Curbelo, Sewell and Nestro's medical malpractice, the Plaintiff suffered injuries including but not limited to tremendous conscious pain and suffering; loss of enjoyment of life; emotional upset, shock, and fright; humiliation; and permanent disability.

84. That between December 24, 2014, and January 1, 2015 the medical treatment provided to the Plaintiff was given and rendered in an improper, negligent, and careless manner in that Defendants New York, Corizon, and Ashity failed to employ the skill, care, and diligence commonly and ordinarily possessed by, and required of medical providers in the same locality; and that Defendants New York, Corizon, and Ashity failed to employ reasonable and proper steps, procedures, and practices for the health, welfare, and safety of the Plaintiff.

85. That as a result of Defendants New York, Corizon, and Ashity's medical malpractice, the Plaintiff suffered injuries including but not limited to tremendous conscious pain and suffering; loss of enjoyment of life; emotional upset, shock, and fright; humiliation; and permanent disability.

86. That by reason of the aforesaid cause of action, the Plaintiff was damaged in an amount which exceeds the jurisdictional limitations of all lower courts which would otherwise have jurisdiction over this action.

## SIXTH CAUSE OF ACTION – COMMON LAW NEGLIGENCE AGAINST DEFENDANTS WESTCHESTER, SANTIAGO, NEW YORK, DUFFY, OWENS AND ACKERIDGE

87. Plaintiff incorporates the allegations contained in the previous paragraphs and further alleges as follows:

88. That Defendants Westchester, Santiago, New York, Duffy, Owens, and Ackeridge owed the Plaintiff a duty to keep him safe from harm and violence.

89. That Defendants Westchester and Santiago breached their duty to the Plaintiff when they failed to transfer proper information regarding the Plaintiff's serious medical condition to Plaintiff's transferring jail at Rikers Island on December 24, 2014.

90. That the natural and probable consequence of the negligence, recklessness, and carelessness by Defendants Westchester and Santiago was that the Plaintiff would not be housed accordingly at Rikers Island despite his serious medical condition and subjected to violence by other inmates.

91. That the negligence of Defendants Westchester and Santiago were the direct and proximate cause of the injuries sustained by the Plaintiff during an assault upon him at Rikers Island on January 1, 2015.

92. That Defendants New York, Duffy, Owens and Ackeridge breached their duty to

the Plaintiff when they failed to properly supervise his jail unit and protect him from violence caused by other inmates when he was placed into a housing unit that did not account for his serious medical condition.

93. That the natural and probable consequence of the negligence, recklessness, and carelessness by Defendants New York, Duffy, Owens, and Ackeridge was that the Plaintiff would be subject to harm and violence from other inmates due to his having a serious medical condition and not being able to protect himself.

94. That the negligence of Defendants New York, Duffy, Owens, and Ackeridge were the direct and proximate cause of the injuries sustained by the Plaintiff during an assault upon him at Rikers Island on January 1, 2015.

95. That by reason of the aforesaid cause of action, the Plaintiff was damaged in an amount which exceeds the jurisdictional limitations of all lower courts which would otherwise have jurisdiction over this action.

## SEVENTH CAUSE OF ACTION – RESPONDEAT SUPERIOR

96. Plaintiff incorporates the allegations contained in the previous paragraphs and further alleges as follows:

97. That Defendants Curbelo, Sewell, and Nestro were hired by Defendants Westchester, CCS, and NYCCS and acted in furtherance and within the scope of said employment at all times between August 26, 2014 and September 10, 2014 and that Defendants Westchester, CCS, and NYCCS had the ability to control, command, manage, supervise, and direct their respective employees at all times between August 26, 2014 and September 1, 2014.

98. That Defendant Santiago was hired by Defendant Westchester and acted in furtherance and within the scope of said employment on December 24, 2014 and that Defendant Westchester had the ability to control, command, manage, supervise, and direct its employees at all times on December 24, 2014.

99. That Defendants Westchester, CCS, and NYCCS are vicariously liable for the tortious acts committed by its employees within the scope of the employment relationship and are vicariously liable for the injuries sustained by the Plaintiff.

100. That Defendant Ashity was hired by Defendants New York and Corizon and acted in furtherance and within the scope of said employment at all times between December

24, 2014 and January 1, 2015 and that Defendants New York and Corizon had the ability to control, command, manage, supervise, and direct their respective employees at all times between December 24, 2014 and January 1, 2015.

101. That Defendants Duffy, Owens, and Ackeridge were hired by Defendant New York and acted in furtherance and within the scope of said employment at all times between December 25, 2014 and January 1, 2015 and that Defendant New York had the ability to control, command, manage, supervise, and direct their respective employees at all times between December 25, 2014 and January 1, 2015.

102. That Defendants New York and Corizon are vicariously liable for the tortious acts committed by its employees within the scope of the employment relationship and are vicariously liable for the injuries sustained by the Plaintiff.

103. That by reason of the aforesaid cause of action, the Plaintiff was damaged in an amount which exceeds the jurisdictional limitations of all lower courts which would otherwise have jurisdiction over this action.

WHEREFORE, Plaintiff requests the following relief:

A. Award compensatory damages as the jury may determine;
B. Award reasonable attorney's fees, costs, and disbursements; and
C. Such other and further and general relief which the Court deems proper or appropriate.

Dated: New Rochelle, NY
May 9, 2016

Jared R. Rice (JR3885)
Rice & Rice Attorneys At Law
Attorneys for Plaintiff
270 North Avenue, Suite 202
New Rochelle, NY 10801
914-633-9200