UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

BRANDON RODRIGUEZ,

                                    Plaintiff,

                    -v-

COUNTY OF WESTCHESTER, CORRECT CARE
SOLUTIONS LLC, NEW YORK CORRECT CARE
SOLUTIONS MEDICAL SERVICES PC, JANEL
SEWELL, MARIA NESTRO, STEVEN SANTIAGO,
and DOLORES CURBELO, M.D.,

                                    Defendants.

------------------------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED:   *I-II-I7* |

15 Civ. 9626 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

Plaintiff Brandon Rodriguez brings this action under 42 U.S.C. § 1983 and state law,

claiming that his rights were violated in connection with allegedly deficient medical care that he

received, for symptoms later diagnosed as multiple sclerosis, while he was incarcerated at the

Westchester County Jail ("WCJ").  Rodriguez entered into a settlement with some defendants, as

to whom his claims have been dismissed with prejudice.  The remaining defendants now move to

dismiss under Federal Rule of Civil Procedure 12(b).  Defendant Steven Santiago argues that

Rodriguez's complaint does not adequately allege that Santiago was deliberately indifferent to

Rodriguez's medical needs, and that Santiago is entitled to qualified immunity.  Defendants

County of Westchester ("Westchester"), Correct Care Solutions LLC ("CCS"), New York

Correct Care Solutions Medical Services PC ("NYCCS"), Dolores Curbelo, M.D., Janel Sewell,

and Maria Nestro argue that Rodriguez did not exhaust his administrative remedies before filing

suit, and that his complaint does not adequately allege municipal liability claims against

Westchester and CCS and NYCCS, deliberate indifference to Rodriguez's medical needs by
Sewell, Nestro, and Curbelo, supervisor liability for Curbelo, and various elements of state-law
claims.

For the following reasons, the Court grants the motions to dismiss (1) the § 1983 claims
against Curbelo and Santiago and (2) the § 1983 municipal liability claims against Westchester,
CCS, and NYCCS; but denies the motions to dismiss (3) the § 1983 claims against Sewell and
Nestro and (4) all claims brought under state law.

**I.      Background**[1]

**A.      Factual Allegations**

Rodriguez's claims arise from his incarceration at the WCJ beginning in 2014, and the
response of corrections and medical personnel there to his deteriorating medical condition, which
ultimately led to a diagnosis of multiple sclerosis.

**1.      As to the WCJ**

As background to his claims, Rodriguez's Amended Complaint provides information
about the historical quality of care at the WCJ and about the parties responsible for health care
administration at that facility.

With respect to the quality of care, the Amended Complaint incorporates by reference the
written findings from an inspection of the WCJ by the United States Department of Justice
conducted between February 25–28, 2008.[2]  These were set out in DOJ's Findings Letter of

---

[1] The following summary of the factual allegations is drawn from Rodriguez's Amended
Complaint ("AC"), filed on May 9, 2016.  Dkt. 47.  The Court also received declarations by each
side that attached either the original or amended complaints, *see* Dkts. 31, 57, 68, 70, but did not
otherwise recite or attach material cognizable on the pending motions.

[2] The inspection was performed pursuant to the Civil Rights of Institutionalized Persons Act
("CRIPA"), 42 U.S.C. § 1997.

November 19, 2009 ("DOJ Report").   AC ¶¶ 22, 26.  The DOJ Report found a pattern at the WCJ of failing (1) to protect inmates from harm from staff and (2) to provide inmates with adequate medical and mental health care, both resulting in violations of inmates' constitutional rights.  *Id.* ¶ 23.  It recommended better health care practices at the WCJ, including improving medical intake screening to identify observable and non-observable medical needs and ensuring timely access to a physician when an inmate presented symptoms requiring care.  *Id.* ¶ 25.

With respect to responsibility for providing health care to WCJ inmates, the Amended Complaint alleges that, between May 6, 2008 and July 25, 2010, pursuant to an agreement with Westchester County, health care was provided to WCJ prisoners by the Westchester County Health Care Corporation ("WCHCC"), a public benefit corporation controlled by the Westchester Medical Center ("WMC").  *Id.* ¶ 21.  Beginning on July 26, 2010, however, Westchester used defendants CCS and NYCCS to provide health care to WCJ prisoners, discontinuing the WCJ's affiliation with WMC.  *Id.* ¶ 27.

### 2. As to Rodriguez

On August 26, 2014, Rodriguez, then age 18, was arrested and incarcerated at the WCJ. *Id.* ¶ 33.  During the intake screening process, Rodriguez told a non-party mental health provider at the WCJ that he was "dizzy."  *Id.*

On August 27, 2014, Rodriguez complained to Sewell, a WCJ nurse employed by CCS and NYCCS, of dizziness, a headache, and blurred vision.  *Id.* ¶¶ 10, 34.  Rodriguez asked Sewell to see a doctor, but Sewell did not refer Rodriguez to one.  *Id.* ¶ 34.  Rodriguez's symptoms of dizziness, headache, and blurred vision continued for eight days.  *Id.*

On September 4, 2014, Rodriguez again complained to Sewell of ringing in his ear, dizziness, nausea, blurriness in his eyes; and he told her he could not "feel the left side of his

face." *Id.* ¶ 35.  Rodriguez fell off his bed as a result of his dizziness and was helped up by Sewell.  *Id.*  He asked to be taken to the hospital or to see a doctor, but Sewell rebuffed those requests and treated him with a pain reliever.  *Id.*  Throughout the evening of September 4, 2014, Rodriguez went in and out of consciousness and eventually hit his head on a sink and lost consciousness until the next morning.  *Id.*

During the afternoon of September 5, 2014, Rodriguez was seen by Curbelo, a WCJ doctor employed by CCS and NYCCS, who diagnosed Rodriguez with an ear infection and treated him with eardrops and nausea medication.  *Id.* ¶¶ 9, 36.  He was later observed by Nestro, a WCJ nurse employed by CCS and NYCCS, as being very dizzy and nauseous, unable to move his left arm and left leg, having blurred vision, and unable to drink anything.  *Id.* ¶¶ 11, 36.  That evening, Rodriguez told Sewell that his ongoing dizziness made his gait unsteady and that he wanted the ringing in his ear to go away.  *Id.* ¶ 36.

On September 6, 2014, Rodriguez was seen sleeping in his bed most of the day by two non-party WCJ nurses, and experienced somnolence and diminished wakefulness.  *Id.* ¶ 37.

On September 7, 2014, Rodriguez was again observed, by two non-party nurses at WCJ, sleeping in his bed for most of the day; he continued to suffer from somnolence and diminished wakefulness.  *Id.* ¶ 38.

On September 8, 2014, Rodriguez was seen in the morning by Curbelo, who did not diagnose any neurological problems or refer Rodriguez to a neurologist or other specialist.  *Id.* ¶ 39.  At this point, Rodriguez was unable to eat food.  *Id.*  Later in the evening, a non-party WCJ nurse observed that Rodriguez was still suffering from somnolence, diminished wakefulness, and vomiting.  However, Rodriguez was not referred to a medical specialist or diagnosed with any neurological conditions.  *Id.*

4

On September 9, 2014, Rodriguez was again seen in the morning by Curbelo, who observed that he suffered from somnolence, diminished wakefulness, and nasal congestion.  *Id.* ¶ 40.  That afternoon, Nestro also observed these symptoms, and that Rodriguez was unable to eat and did not feel like talking.  *Id.*  That afternoon, Rodriguez met with a non-party WCJ social worker, and became upset and frustrated about having not been taken to the WMC for care.  *Id.* That evening, Sewell met with Rodriguez, who complained of nausea, blurred vision, an inability to eat, and that his somnolence and diminished wakefulness was worsening.  *Id.*  Rodriguez was not diagnosed with a neurological condition or referred to a medical specialist.  *Id.*

At about 12:35 a.m. on September 10, 2014, a non-party WCJ mental health provider attempted to interview Rodriguez.  *Id.* ¶ 41.  But, Rodriguez appeared weak and was not able to answer any questions, and could only whisper incoherent words.  *Id.*  Approximately 10 minutes later, at 12:45 a.m., Sewell examined Rodriguez and did not record anything wrong with him. *Id.*

At about 8:50 a.m. the same morning, Rodriguez was going into and out of consciousness when Nestro noticed that his right pupil was higher than his left pupil and that his right eye was half-closed.  *Id.* ¶ 42.  At around 12:35 p.m., Curbelo examined Rodriguez and noticed the same symptoms.  At 12:55 p.m., an ambulance was called to take Rodriguez to the WMC.  *Id.*  At approximately 1:30 p.m., Rodriguez was transported and later admitted to the WMC.  *Id.* ¶ 43. His symptoms included facial, leg, and arm numbness, double vision in his left eye, closure of his right eye, dizziness, gait imbalance, slurred speech, and ear ringing with some hearing loss. *Id.*

At WMC, Rodriguez received access to a neurologist, diagnostic testing, steroid treatment, and other medical care. *Id.* ¶ 44. On October 1, 2014, he was discharged back to the WCJ. *Id.*

Later in October 2014, Rodriguez was officially diagnosed with multiple sclerosis. *Id.* During October 2014, Rodriguez was denied physical therapy at WCJ. *Id.*

On December 11, 2014, after his multiple sclerosis symptoms worsened, Rodriguez was again admitted to WMC with symptoms including seizures, face and arm numbness, ringing in his ear, and severe headaches. *Id.* ¶ 45. At WMC, Rodriguez was treated by a neurologist, and with steroids and other medical care. *Id.* ¶ 46. On December 15, 2014, he was transferred back to WCJ. *Id.* At WCJ, Rodriguez was treated at that time with the steroid Prednisone. *Id.*

On December 24, 2014, Rodriguez was transferred from the WCJ to the New York City Jail at Rikers Island ("Rikers"). *Id.* ¶ 47. Santiago, a corrections officer employed by Westchester, was instructed to provide Rikers with Rodriguez's Patient Summary Profile ("PSP"), which outlined Rodriguez's deteriorating health and indicated that Rodriguez needed to be housed in an infirmary. *Id.* ¶¶ 12, 47, 68. Santiago failed to do so. *Id.* ¶ 47.

At Rikers, Rodriguez told officials that he had multiple sclerosis and had recently been hospitalized for it, and that he was taking the steroid Prednisone. *Id.* ¶ 48. He also explained that he had a follow-up examination scheduled, and was experiencing weakness and had pain in his right arm and left leg. *Id.* Rodriguez's complaints were ignored; he was denied Prednisone, and not admitted to an infirmary unit. *Id.*

Rodriguez signed into protective custody at Rikers, but, on December 25, 2014, was transferred to the George Motchan Detention Center within Rikers. *Id.*

On January 1, 2015, Rodriguez was attacked by six other prisoners, members of the Patria gang, who used knives, chairs, and other weapons, along with their fists and feet, to injure Rodriguez, causing 18 puncture wounds to his chest, back, face, arms, and a laceration to his left hand that required six stitches. *Id.* ¶ 49.

**B.    Procedural History**

On December 9, 2015, Rodriguez filed a Complaint, Dkt. 1, and, on December 14, 2015, a corrected complaint, which corrected certain typographical errors.  Dkt. 8.  On March 9, 2016, Santiago filed a motion to dismiss, Dkt. 30, and a memorandum of law in support, Dkt. 33.  On March 10, 2016, Westchester, CCS, NYCCS, Curbelo, Sewell, and Nestro filed a motion to dismiss, Dkt. 35, and a memorandum of law in support, Dkt. 37.

On May 9, 2016, Rodriguez filed the Amended Complaint.  Dkt. 47.  On May 18, 2016, Santiago notified the Court by letter that he would rely on his previously-filed motion to dismiss. Dkt. 51.  On May 20, 2016, Westchester, CCS, NYCCS, Curbelo, Sewell, and Nestro (the "Westchester Defendants") filed a motion to dismiss the Amended Complaint, Dkt. 55, and a memorandum of law in support, Dkt. 56.  On June 24, 2016, Rodriguez filed memoranda of law in opposition to the two motions to dismiss, Dkts. 69 ("Rodriguez Opposition I"), 71.  On June 28, 2016, Santiago filed a reply, Dkt. 72.  On July 1, 2016, the Westchester defendants filed a reply.  Dkt. 73.

On May 24, 2016, the Court held an initial pretrial conference and issued a civil case management plan, Dkt. 60, that provided for discovery with respect to then-defendants City of New York, Corizon Health Inc., Daniel Ashity, Edmund Duffy, Renee Ackerman, and Monique Owens (the "New York City Defendants"), *see* Dkt. 62.  In light of the Westchester Defendants' pending motions to dismiss, the Court stayed discovery as to those defendants.  *Id.*  The Court

referred the New York City Defendants to Magistrate Judge James L. Cott for settlement, Dkt. 61, and, on August 30, 2016, at a settlement conference before Judge Cott, Rodriguez reached a settlement with those defendants.  On September 14, 2016, at the request of those parties, the Court issued an order of dismissal with prejudice as to Rodriguez's claims against the New York City Defendants.  Dkt. 81.

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)).  However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).  A complaint is properly dismissed where, as a matter of

law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

## III.   Discussion

Rodriguez brings three claims under § 1983: (1) a *Monell* claim against Westchester, CCS, and NYCCS, alleging that those defendants' policy, practice, and custom was to provide constitutionally inadequate health care to prisoners at the WCJ, AC ¶¶ 54–58; (2) a claim against Curbelo, Sewell, Nestro, and Santiago for deliberate indifference to Rodriguez's medical needs at the WCJ, *id.* ¶¶ 63–69; and (3) a supervisory liability claim against Curbelo, *id.* ¶¶ 77–78, 80. He brings three claims under New York state law: (1) a medical malpractice claim against Westchester, CCS, NYCCS, Curbelo, Sewell, and Nestro, *id.* ¶¶ 81–83, 86; (2) a negligence claim against Westchester and Santiago, *id.* ¶¶ 87–91, 95; and (3) a claim for *respondeat superior* against Westchester, CCS, and NYCCS, *id.* ¶¶ 96–99, 103.

Santiago moves to dismiss on the grounds that the Amended Complaint does not adequately allege he was deliberately indifferent to Rodriguez's medical needs and that he is entitled to qualified immunity for his actions. The Westchester Defendants move to dismiss on the grounds that the Amended Complaint does not adequately allege (1) municipal liability under *Monell;* (2) deliberate indifference to medical needs, (3) exhaustion of administrative remedies, or (4) the elements of the state-law claims. The Court addresses these arguments in turn.

### A.   Municipal Liability Under § 1983

A plaintiff cannot establish municipal liability under § 1983 based on a theory of *respondeat superior.* *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). To hold a municipality liable under § 1983 for its employees' unconstitutional actions, a plaintiff must instead prove a municipal policy or custom that directly caused the plaintiff to be subjected to a

constitutional violation.  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); *see also*

*Amensty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004) ("[C]onstitutional torts

committed by city employees without official sanction or authority do not typically implicate the

municipality in the deprivation of constitutional rights, and therefore the employer-employee

relationship is in itself insufficient to establish the necessary causation." (internal quotation

marks and citation omitted)); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)

(the "first inquiry in any case alleging municipal liability under § 1983 is the question of whether

there is a direct causal link between a municipal policy or custom and the alleged constitutional

deprivation").

A plaintiff can establish the existence of a policy or custom by demonstrating "(1) a

formal policy officially endorsed by the municipality; (2) actions taken by government officials

responsible for establishing the municipal policies that caused the particular deprivation in

question; (3) a practice so consistent and widespread that, although not expressly authorized,

constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4)

a failure by policymakers to provide adequate training or supervision to subordinates to such an

extent that it amounts to deliberate indifference to the rights of those who come into contact with

the municipal employees."  *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77

(S.D.N.Y. 2010) (collecting cases) (internal citations omitted).

A plaintiff claiming his or her rights were violated must, of course, establish that the

challenged conduct constitutes state, as opposed to private, action.  *E.g.*, *Grogan v. Blooming

Grove Volunteer Ambulance Corps.*, 768 F.3d 259, 263 (2d Cir. 2014).  This requires that the

alleged constitutional deprivation have been caused by the exercise of a right or privilege created

by the state, by a rule of conduct imposed by the state, or by a person for whom the state is

responsible, *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 111 (2d Cir. 2003) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)), such that the "allegedly unconstitutional conduct is fairly attributable to the state." *Sullivan*, 526 U.S. at 50. Where the actions at issue were by a nominally private entity, to show state action, a plaintiff must show "that there is a sufficiently close nexus between the State and the challenged action . . . so that the action . . . may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1973); *Grogan*, 768 F.3d at 263. And because vicarious liability does not exist under § 1983, to find a private entity acting under color of state law liable under § 1983, the plaintiff must prove the conduct that caused the constitutional deprivation was pursuant to an official policy, practice, or custom. *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990).

Here, defendants CCS and NYCCS are private companies with whom Westchester contracted to provide the medical care and treatment services it is required to provide to prisoners at the WCJ. AC ¶¶ 7–8. As such, when performing those duties, they acted under color of state law and were state actors—and CCS and NYCCS do not argue the contrary. *See Rembert v. Cheverko*, 12 Civ. 9196 (KBF), 2014 WL 3384629, *4 n.8 (S.D.N.Y. July 10, 2015) (CCS is a state actor suable under § 1983); *West v. Atkins*, 487 U.S. 42, 56–57 (1988) (doctor hired by state to provide medical care to prisoners was state actor as doctor was vested by state to fulfill its constitutional duty to provide necessary medical care to prisoners in its custody).

However, Rodriguez's municipal liability claims alleged against Westchester, CCS, and NYCCS under § 1983 must be dismissed under *Monell*, because the Amended Complaint fails to allege—other than conclusorily—a policy, practice, or custom that caused a deprivation of his Fourteenth Amendment right to medical care while a state prisoner. It alleges, in fact, no facts indicative of any such policy, practice, or custom.

11

To be sure, the Amended Complaint broadly declares that there was an "inadequate medical intake screening process of inmates and detainees"; "inadequate guidelines related to the transportation of inmates and detainees with serious medical needs to WMC"; a "lack of access to specialty medical services provided by WMC"; and "inadequate administration of medication in accordance generally accepted professional standards of care." AC ¶ 56. And it alleges that these deficient practices caused "deliberate indifference to [Rodriguez's] serious medical needs." *Id.* ¶¶ 57–58.

The Amended Complaint, however, is devoid of concrete factual allegations that would support that—however grave the deficiencies in Rodriguez's care—there was a policy, practice, or custom from which these lapses derived. It does not, for example, recite facts of other examples of comparable conduct,[3] or admissions by percipient personnel to the effect that officials' decisions not to pay greater heed to Rodriguez's deteriorating condition was the product of a policy, practice or custom, as opposed to being an individualized wrong.[4]

---

[3] The Amended Complaint, in support of its § 1983 municipal liability claim, does conclusorily allege that other, similar incidents of deficient medical care have been alleged against Westchester, CCS, and NYCCS, declaring the existence of "internal complaints, press clippings, and pleadings." AC ¶ 52. It also mentions a lawsuit "regarding similar claims of inadequate and timely medical treatment" by Westchester, CCS, and NYCCS. *Id.* But, the municipal claims in that lawsuit—brought by Rodriguez's counsel on behalf of a different client—were dismissed, prior to the filing of the Amended Complaint in this case, and the case involved different individual defendants. *See Melvin v. Cty. of Westchester*, 14 Civ. 2995 (KMK), 2016 WL 1254394, at *11–17 (S.D.N.Y. Mar. 29, 2016). That lawsuit does not help establish the existence of a policy, practice, or custom in this case. And, even if the claims in *Melvin* had not been dismissed, the existence of a single similar lawsuit is insufficient to establish municipal liability under *Monell*. *See Calderon v. City of New York*, 138 F. Supp. 3d 593, 611–14 (S.D.N.Y. 2015).

[4] Elaborating on his theory of municipal liability in his opposition brief, Rodriguez states that the official policy that deprived Rodriguez of constitutionally required medical care was actually the decision to discontinue WCJ's use of WMC and WCHCC to provide medical care for WCJ prisoners and switch to the contracting for medical care with CCS and NYCCS, contractors whom Rodriguez calls inferior. A party may not modify its complaint by statements or arguments made in motion papers. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d

"[A]llegations that [defendants] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient." *Missel v. Cty. of Monroe*, 351 Fed. App'x 543, 545 (2d Cir. 2009) (summary order) (citing *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993), *overruled on other grounds*, *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993). Indeed, Judge Karas recently dismissed similarly conclusory *Monell* claims that policies, practices, customs at the WCJ "led to the refusal to provide adequate medical care to WCJ inmates and detainees; to the delay of proper care to WCJ inmates and detainees; to the negligent training of its employees; to the lack of physician access for WCJ inmates and detainees; and to the misdiagnosis and indifference of [Decedent's] serious medical needs"; these, he held, were "bare assertions" that "will not sustain a *Monell* claim." *See Melvin*, 2016 WL 1254394, at *15 (alterations in original).

To the extent that Rodriguez relies on the DOJ Report, that report cannot establish the existence of a relevant policy, practice or custom. *See, e.g.*, Rodriguez Opposition I at 8–13. The DOJ Report was based on a CRIPA investigation of medical care at the WCJ conducted in February 2008, more than six years before the events involving Rodriguez. AC ¶ 22. At the time, Westchester contracted with a different company for medical services at WCJ; in July 2010, it switched contractors, to CCS and NYCCS. *Id.* ¶¶ 7–8, 22. As such, the findings of lapses in the DOJ Report are too stale, and too disconnected in personnel, to plausibly allege a policy, practice, or custom extant in 2014 so as to affect Rodriguez. *See Melvin*, 2016 WL 1254394, at *15 (dismissing *Monell* claims against Westchester, CCS, and NYCCS and noting

Cir. 1998) (citation omitted). In any event, Rodriguez does not supply factual support for the claim that the medical care provided by CCS and NYCCS is inferior to that of which WMC and WCHCC provided, let alone that this level of care commonly results in denials of prisoners' constitutional rights as to such care.

13

that the DOJ Report was based on medical services provided by a different contractor, such that
"there is no basis to attribute the resulting report to CCS's and NYCCS's performance nearly
four years later under a subsequent contract") (citing *Thomas v. Westchester Cty.*, 12 Civ. 6718
(CS), 2013 WL 3357171, at *6 (S.D.N.Y. July 3, 2013) (dismissing *Monell* claims against
Westchester, CCS, and NYCSS where allegations were based on the DOJ Report)).  And the
DOJ Report could not have put CCS nor NYCCS on notice of unconstitutional acts by their
employees, because it addressed improprieties by employees of a previous contractor.  *See*
*Melvin*, 2016 WL 1254394, at *15.

Because the Amended Complaint fails to plausibly plead a policy, practice, or custom of
Westchester, CCS, and NYCCS pursuant to which Rodriguez's constitutional rights were
violated, his municipal liability claims against them under § 1983 must be dismissed.

### B.      Deliberate Indifference to Rodriguez's Medical Needs

The Amended Complaint alleges that Sewell, Nestro, Curbelo and Santiago were
deliberately indifferent to Rodriguez's medical needs.

#### 1.      Applicable Legal Standards

The Eighth Amendment protects prisoners from "cruel and unusual punishments" caused
by prison officials.  U.S. Const. amend. VIII.  The Eighth Amendment, however, only applies to
convicted prisoners, while claims by pretrial detainees, such as Rodriguez, are properly brought
under the Fourteenth Amendment.  *See Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009)
("[A] claim for indifference to the medical needs of a . . . pretrial detainee in state custody [is]
properly brought under the Due Process Clause of the Fourteenth Amendment.").  Regardless of
whether the right originates in the Eighth or the Fourteenth Amendment, the substantive standard
is the same.  *Id.* at 72 ("Claims for deliberate indifference to a serious medical condition or other

serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Simpson v. Town of Warwick Police Dept.*, 159 F. Supp. 3d 419, 443 (S.D.N.Y. 2016).

Critically as to those standards, not every claim of insufficient medical care by an arrestee rises to the level of a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Rather, to establish an Eighth or Fourteenth Amendment violation arising out of inadequate access to medical care, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 at 104).

Deliberate indifference has both objective and subjective elements. The objective element requires that the "alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks and citation omitted). Various factors inform whether a medical condition is sufficiently serious, including (1) the "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment;" (2) "the presence of a medical condition that significantly affects an individual's daily activities;" (3) "the existence of chronic and substantial pain," *Chance v. Armstrong*, 143 F.3d at 702; and (4) "adverse medical effects or demonstrable physical injury," *see Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

The subjective element requires that the "charged official . . . act with a sufficiently culpable state of mind," meaning that "the official acted with deliberate indifference to inmate health." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 302 (1991)). This requires that the prison official knew of and disregarded the

plaintiff's serious medical needs. *Chance*, 143 F.3d at 703 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). As such, a prison official may be deliberately indifferent when he or she, when disregarding a plaintiff's serious medical needs, "was both aware of facts from which the inference could be drawn that a serious risk of harm existed, and also drew the inference." *Caiozzo*, 581 F.3d at 72 (alterations and internal quotation marks omitted) (citing *Farmer*, 511 U.S. at 837). Prison officials "need only be aware of the risk of harm, not intend harm." *Spavone v. New York State Dept. of Correctional Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). "[A]wareness may be proven 'from the very fact that the risk was obvious.'" *Id.* (quoting *Farmer*, 511 U.S. at 842).

It is, however, "well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance*, 143 F.3d at 703 (citation omitted). Negligence, even if medical malpractice, does not, without more, violate the Constitution. *Id.* Medical malpractice may rise to the level of deliberate indifference when it involves culpable recklessness, meaning an act or omission by the prison official that reveals a conscious disregard of a substantial risk of serious harm. *Id.* (citation omitted). "[A] physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Id.* (citation omitted).

Finally, deliberate indifference claims, like other § 1983 claims against individual defendants, must allege the personal involvement of the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

### 2.      Analysis

Here, defendants do not contest that Rodriguez's symptoms, as alleged, constituted an objectively serious medical condition.  They seek dismissal instead based on Rodriguez's pleadings as to the subjective element.  Dkts. 33 at 4–5, 56 at 9–10.  And, the Court finds the symptoms alleged were sufficiently objectively serious so as to meet that first element. Rodriguez alleges, *inter alia*, blurred vision, an inability to feel the left side of his face, drifting into and out of consciousness, ringing ears, an inability to move his left arm and left leg, and uneven orientation of his pupils.  These symptoms, viewed in combination, reveal a condition that a reasonable doctor or patient would surely consider important and meriting comment or treatment, and that would significantly affect the patient's daily activities, and reflect the existence of substantial pain.  *See Chance*, 143 F.3d at 702; *see also Clay v. Morgan*, 79 Fed. App'x 940, 941 (8th Cir. 2003) (prisoner's "possible" multiple sclerosis constituted a serious medical need) (unpublished).

As such, the Court examines the allegations against each defendant with respect to the subjective element of the deliberate indifference standard.

### a.      Sewell, Curbelo, and Nestro

Sewell, a nurse at WCJ, was the first defendant alleged to have met with Rodriguez.  On August 27, 2014, Rodriguez complained to Sewell of dizziness, a headache, and blurred vision. AC ¶¶ 10, 34.  Rodriguez asked Sewell to see a doctor, but Sewell did not refer Rodriguez to one. *Id.* ¶ 34.  These symptoms of dizziness, headache, and blurred vision continued for eight days, and, on September 4, 2014, Rodriguez complained to Sewell again, mentioning ear ringing, dizziness, nausea, and blurred vision, and that he could not feel the left side of his face. *Id.* ¶¶ 34–35.  And, on September 4, 2014, Rodriguez fell off his bed as a result of his dizziness and

was helped up by Sewell.  *Id.* ¶ 35.  He pleaded to be taken to the hospital or to see a doctor, but Sewell disregarded these requests and treated him with a pain reliever.  *Id.*  Throughout the evening of September 4, 2014, Rodriguez went in and out of consciousness, and eventually hit his head on a sink and lost consciousness until the next morning.  *Id.*  In the evening of September 5, 2014, Rodriguez complained to Sewell that his gait was unsteady due to dizziness and that he wanted the ringing in his ear to go away.  *Id.* ¶ 36.  On September 9, 2014, Rodriguez met with Sewell in the evening, and Rodriguez complained of nausea, blurred vision, an inability to eat, and worsening of his somnolence and diminished wakefulness.  *Id.* ¶ 40.

Curbelo, a doctor at WCJ, first met with Rodriguez on September 5, 2014.  *Id.* ¶ 36.  She diagnosed him with an ear infection and treated him with eardrops and nausea medication.  *Id.*  On September 8, 2014, Curbelo again met with Rodriguez, and at that time Rodriguez was unable to eat food.  *Id.* ¶ 39.  On September 9, 2014, Curbelo again saw Rodriguez in the morning, and observed that he suffered from somnolence, diminished wakefulness, and nasal congestion.  *Id.* ¶ 40.  On September 10, 2014, Curbelo examined Rodriguez and saw that his right pupil was higher than his left pupil and that his left eye was closed halfway.  *Id.* ¶ 42.  An ambulance was called shortly thereafter.  *Id.*

Nestro, a nurse at WCJ, first met with Rodriguez on September 5, 2014.  *Id.* ¶ 36.  After Rodriguez was examined by Curbelo that day, Nestro observed that Rodriguez exhibited symptoms of being very nauseous and dizzy, blurred vision, and was unable to drink anything or move his left arm and left leg.  *Id.*  On September 9, 2014, Nestro observed that Rodriguez suffered from somnolence, diminished wakefulness, could not eat, and did not feel like talking.  *Id.* ¶ 40.  Finally, on September 10, 2014, at about 8:50 a.m., as Rodriguez drifted into and out of consciousness, Nestro saw that Rodriguez's right pupil was higher than his left and that his right

eye was half closed.  *Id.* ¶ 42.  An ambulance was called for Rodriguez about four hours later.
*See id.*

These allegations are sufficient to satisfy the subjective element for Sewell and Nestro
but not for Curbelo.  Both Sewell and Nestro observed that Rodriguez was exhibiting symptoms
of blurred vision and an inability to move his left arm and left leg or feel the left side of his face.
Sewell also helped Rodriguez up after he fell out of his bed due to dizziness.  These symptoms
are indicative of significant neurological abnormalities and were observed by September 4 and 5,
2014.  But, as alleged, neither Sewell nor Nestro addressed them, other than by Sewell's having
given him a pain reliever on September 4, 2014, or undertook further investigation until
Rodriguez was taken to the hospital on September 10, 2014, after his pupils were observed to be
in an uneven orientation and he was drifting into and out of consciousness.  Significant, too,
during this period, Rodriguez complained multiple times of associated symptoms such as
dizziness and nausea, and he was observed by multiple non-party medical staff as experiencing
somnolence and diminished wakefulness.

These allegations plausibly support that (1) Sewell and Nestro were aware of Rodriguez's
serious symptoms and that they constituted a serious risk of harm, and (2) by not enhancing their
treatment or further investigating his symptoms, they disregarded his medical needs, so as to
constitute deliberate indifference to those needs.  The Amended Complaint thus faults these
defendants for their inaction, not for a mere disagreement over the choice of a particular
treatment.  *Cf. Hathaway v. Coughlin*, 37 F.3d 63, 70 (2d. Cir. 1994) (courts will not second
guess medical determinations when dispute is about a choice of a particular course of treatment,
whereas "the absence of help" may support a deliberate indifference claim); *Johnson v. Wright*,
234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) (same; "deliberate indifference will be found where

the medical attention rendered was so woefully inadequate as to amount to no treatment at all" (quotation and internal alterations omitted)).

As to Curbelo, in contrast, the Amended Complaint does not satisfactorily allege that she was aware of these symptoms.  Rodriguez alleges that Curbelo did not see him until September 5, 2014, and does not allege that she was aware of or otherwise observed or was informed of his particular symptoms, only that she "misdiagnosed" him as having an ear infection and treated it with eardrops and nausea medication.  AC ¶ 36.  The Amended Complaint claims that when Curbelo examined Rodriguez on September 8, 2014, she recklessly failed to refer him to a neurologist despite his "obvious symptoms of a neurological disorder," but it does not identify the particular symptoms that Curbelo had observed or otherwise been made aware of.  *Id.* ¶ 39.  Instead, its claim of a reckless failure on her part to diagnose, treat, or refer Rodriguez for further care is conclusory.  *Id.* ¶¶ 36–41, 66–67.  To be sure, Rodriguez does allege that, on September 9, 2014, Curbelo saw he was suffering from somnolence, diminished wakefulness, and nasal congestion.  *Id.* ¶ 40.  But, those symptoms are not serious enough to reveal an awareness by Curbelo of a serious medical need of Rodriguez's.

The first time that, in fact, Rodriguez alleges Curbelo was able to observe that he had serious symptoms was on September 10, 2014, when Curbelo noticed Rodriguez's uneven pupils.  And, it alleges, she called an ambulance 20 minutes later.  *Id.* ¶ 42.  The Amended Complaint does not allege facts from which an inference of subjective awareness by Curbelo of a serious medical condition could be drawn prior to that day.  The claim against her for deliberate indifference thus must be dismissed.

The Court, therefore, denies the motion to dismiss the claims of deliberate indifference against Sewell and Nestro but grants Curbelo's motion to dismiss that claim against her.

20

###### b. Santiago

The single factual allegation against Santiago, a corrections officer at WCJ, is that, as part of Rodriguez's transfer from WCJ to Rikers on December 24, 2014, he was instructed to provide Rikers with Rodriguez's PSP but failed to do so. *Id.* ¶¶ 47, 68. The PSP outlined Rodriguez's deteriorating health and indicated that he needed to be housed in an infirmary unit while incarcerated. *Id.* ¶ 68.

The deliberate indifference claim against Santiago must be dismissed because this factual claim does not plausibly allege Santiago's subjective knowledge of Rodriguez's serious medical needs. *See Chance*, 143 F.3d at 703; *see also Alston v. Bendheim*, 672 F. Supp. 2d 378, 387 (S.D.N.Y. 2009) ("to maintain a deliberate indifference claim, a Plaintiff must adequately allege that a defendant possessed actual knowledge of a serious medical need.") (citation omitted). There are, in fact, no factual allegations that Santiago was aware that Rodriguez had been diagnosed with multiple sclerosis or that he knew, even at a general level, the contents of the PSP to the extent it indicated Rodriguez's deteriorating health and his need for infirmary placement at Rikers. There is no factual basis on which to infer that Santiago knew that Rodriguez was at a serious risk of harm.

Accordingly, the Court grants the motion to dismiss the deliberate indifference claim as to Santiago.[5]

### C.      Rodriguez's § 1983 Claim Against Curbelo Based on Supervisory Liability

A defendant's supervisory authority is insufficient in itself to create liability under § 1983; instead a showing of personal involvement is necessary. *Richardson v. Goord*, 347 F.3d

---

[5] Because the Court grants Santiago's motion to dismiss the § 1983 deliberate indifference claim against him for failure to state a claim, the Court does not reach Santiago's argument that he is protected by qualified immunity.

431, 435 (2d Cir. 2003) (citation omitted).  The personal involvement required for supervisory

liability may be shown by demonstrating "(1) the defendant participated directly in the alleged

constitutional violation, (2) the defendant, after being informed of the violation through a report

or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4)

the defendant was grossly negligent in supervising subordinates who committed the wrongful

acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to

act on information indicating that unconstitutional acts were occurring."  *Colon*, 58 F.3d at 873.

Here, the Amended Complaint alleges that Curbelo "was responsible for supervising and

training the medical staff" at WCJ "and failed to properly supervise and train the medical staff

regarding the reckless and negligent medical treatment provided to [Rodriguez]," AC ¶ 78, with

the result that Rodriguez's constitutional right to necessary medical care was violated, *id.* ¶ 80.

These allegations, however, do not show that Curbelo knew of Rodriguez's symptoms, whether

from her direct participation in his care or otherwise.  As noted, the Amended Complaint does

not allege that Curbelo learned of Rodriguez's serious symptoms before September 10, 2014,

when he was taken to WMC for hospital care.  Rodriguez's brief declares that, "[i]nstead of

immediately authorizing Rodriguez to be treated by a neurologist at the WMC, [Curbelo] waited

several days until he almost died from his condition."  Rodriguez Opposition I at 18.  But there is

no factual basis in the Amended Complaint for this assertion.

Rodriguez's § 1983 supervisory liability claim against Curbelo must, therefore, be

dismissed.

### D.      Claims Under State Law

The Amended Complaint also brings claims arising under New York law: for (1) medical malpractice against Westchester, CCS, NYCCS, Curbelo, Sewell, and Nestro, AC ¶¶ 82–83, 86; (2) negligence against Westchester and Santiago, *id.* ¶¶ 88–91, 95; and (3) *respondeat superior* against Westchester, CCS, and NYCCS, *id.* ¶¶ 97–99, 103.  These claims were properly brought before the Court as supplemental to Rodriguez's federal claims.  *See* 28 U.S.C. § 1367.  Because the Court has not dismissed all federal claims, the Court will retain supplemental jurisdiction over the state-law claims, *see, e.g.*, *Oladokun v. Ryan*, 06 Civ. 2330 (KMW), 2011 WL 4471882, at *11 (S.D.N.Y. Sept. 27, 2011), and therefore considers the motions to dismiss these claims.

### 1.      Medical Malpractice

Under New York law, medical malpractice requires proof of (1) a deviation or departure from accepted practice, and (2) evidence that the deviation or departure was a proximate cause of injury.  *Torres v. City of New York*, 154 F. Supp. 2d 814, 819 (S.D.N.Y. 2001) (citing *Lyons v. McCauley*, 252 A.D.2d 516, 517 (2d Dep't 1998); *see also Naughright v. Weiss*, 857 F. Supp. 2d 462, 474 (S.D.N.Y. 2012) (prima facie case for medical malpractice requires allegations of a duty of care owed by doctor to plaintiff, a breach of that duty by a deviation from accepted medical practice, and breach proximately caused plaintiff's injury).

Here, Rodriguez brings medical malpractice claims against Westchester, CCS, NYCCS, Curbelo, Sewell, and Nestro.  The allegations in the Amended Complaint make that claim plausible.  There are sufficient factual allegations about Rodriguez's symptoms, treatment, and deteriorating health such that the allegation that the medical care he received was a deviation from accepted medical practice, AC ¶ 82, is plausible.  Among other claims, Rodriguez alleges that, on August 27, 2014, he asked Sewell to be seen by a doctor, *id.* ¶ 34; that on September 4,

2014, that he again asked Sewell to be taken to the hospital, *id.* ¶ 35; that he was misdiagnosed by Curbelo on September 5, 2014 and September 8, 2014, *id.* ¶¶ 36, 39; that, on September 5, 2014, Nestro, after seeing Rodriguez exhibit symptoms of an inability to move his left arm and left leg, blurred vision, and an inability to drink, failed to diagnose Rodriguez, *id.* ¶ 36. These allegations are adequate to make out a prima facie case for medical malpractice against Curbelo, Sewell, and Nestro. *See Melvin*, 2016 WL 1254394, at *19 (medical malpractice adequately alleged by allegations that defendants failed to identify proper treatments or bring prisoner to a medical facility). Rodriguez also alleges that that these actions caused him injuries, such as pain and suffering at the WCJ. *Id.* ¶ 83.

The Court therefore denies the motion to dismiss Rodriguez's medical malpractice claim.

### 2.      Negligence

Under New York law, negligence requires the plaintiff to establish: "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 424 N.E.2d 531, 535 (N.Y. 1981)).

Here, Rodriguez alleges Santiago and Westchester were negligent based on Santiago's failure to transfer Rodriguez's PSP to Rikers when Rodriguez was transferred there from the WCJ on December 24, 2014, despite being instructed to do so, and that this failure caused injury to Rodriguez because it resulted is his being housed among the general population of prisoners at Rikers, and thereby caused the assault and stabbing attack he sustained on January 1, 2015. Amended Complaint ¶¶ 47, 88–91. These allegations sufficiently allege the elements of duty, breach, and injury.

Santiago argues, however, that his actions were not the proximate cause of Rodriguez's injuries, either because his injuries were product of an intervening event, an assault and stabbing by other inmates, or because Rodriguez (independent of the PSP) notified Rikers officials of his medical condition. Dkt. 72 at 3–4. Santiago's arguments as to a lack of proximate causation are not without force, and following discovery, may yet prevail. But the Court declines to dismiss on the pleadings on this ground. Pending factual discovery, it is premature to resolve whether the assault on Rodriguez was a foreseeable consequence of assigning a medically impaired inmate to the Rikers general population, or whether the failure to transfer the PSP affected the decision not to assign him to the infirmary. *Cf. Kush by Marszalek v. City of Buffalo*, 449 N.E.2d 725, 729 (N.Y. 1983) (superseding cause of a third party does not break the causal chain when it is reasonably foreseeable).

The Court therefore denies Westchester's and Santiago's motion to dismiss Rodriguez's state-law claim for negligence.

### 3. *Respondeat Superior*

Under New York law, an employer may be held liable for the tortious acts committed by an employee acting within the scope of his or her employment. *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 416 (S.D.N.Y. 2015); *see also Riviello v. Waldron*, 391 N.E.2d 1278, 1280–81 (N.Y. 1979). "An employee's actions fall within the scope of employment where the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business." *Beauchamp v. City of New York*, 3 A.D.3d 465, 466 (2d Dep't 2004) (quotation omitted). To state a claim for *respondeat superior*, a plaintiff must plead facts demonstrating that the tortious conduct that

caused the injury was committed within the scope of the employee's employment. *De Sole*, 137 F. Supp. 3d at 416 (citing *Doe v. Alsaud*, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014)).

Here, Rodriguez alleges that Westchester, CCS, and NYCCS employed Curbelo, Sewell, and Nestro; that Westchester employed Santiago; and that Curbelo, Sewell, Nestro, and Santiago were each acting within the scope of their employment during the time of the relevant conduct. AC ¶¶ 97–98.  Beyond conclusorily stating that this claim fails to state a claim, defendants do not offer any arguments why it is deficient.  The Court declines to dismiss this claim, because the Amended Complaint adequately alleges that the tortious acts which Curbelo, Sewell, Nestro, and Santiago are alleged to have committed were within the scope of their employment with Westchester, CCS, and NYCCS.

The Court therefore denies defendants' motion to dismiss Rodriguez's *respondeat superior* claim.

### E.   Failure to Exhaust Administrative Remedies

Finally, defendants move to dismiss on the ground that Rodriguez failed to exhaust his administrative remedies before filing this action, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997 *et seq.* ("PLRA").  The Court denies this motion.

The PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 . . .  by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). Exhaustion is required "regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible."  *Booth v. Churner*, 532 U.S. 731, 739 (2001).  It applies to all suits by prisoners, regardless of "whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Critically important, however, "failure to exhaust is an affirmative defense under the PLRA, and . . . inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Failure to exhaust may thereby be grounds for dismissal under Rule 12(b)(6), when, like other affirmative defenses, the allegations in the complaint suffice to establish a failure to exhaust.  *Id.* at 215–16; *see also Williams v. Correction Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) ("[A] district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." (citing *Jones*, 549 U.S. at 215)).  And, even when a prisoner fails to exhaust administrative remedies before filing a complaint in federal court, in some circumstances, relating to the availability of administrative remedies to the prisoner, the failure may be excused.  *See generally Williams*, 829 F.3d at 122–24.

Here, the Amended Complaint is devoid of any allegations regarding the administrative remedies available to Rodriguez and the extent, if any, to which he availed himself of them. And, defendants do not identify any part of the Amended Complaint that might support an inference of a failure to pursue or exhaust such remedies.  While discovery may show that Rodriguez failed adequately to pursue administrative remedies, the Court cannot dismiss this case on the pleadings on this ground.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are granted in part and denied in part. The Court dismisses all § 1983 claims against Curbelo and Santiago and all § 1983 municipal

liability claims against Westchester, CCS, and NYCCS.  However, the Court denies the motions to dismiss the § 1983 claims against Sewell and Nestro and denies the motions to dismiss Rodriguez's state claims.

The Court directs the parties to confer with each other and to file, by Monday, January 23, 2017, a proposed Civil Case Management Plan and Scheduling Order in accordance with the Court's Individual Rules.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: January 11, 2017
      New York, New York